1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CALIXTO C. RACIMO,

11              Petitioner,                  No. CIV S-10-3486 JAM CKD P

12       vs.

13   MICHAEL MARTEL[1],                      ORDER AND

14              Respondent.                  FINDINGS & RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Petitioner, a state prisoner proceeding pro se, has filed a petition pursuant to 28

18   U.S.C. § 2254.  Petitioner challenges his 2008 conviction for second degree murder with a

19   firearm enhancement.  He is serving a state prison term of sixteen years to life.  This action

20   proceeds on the First Amended Petition filed on January 31, 2011.  (Dkt. No. 7 ("Pet.").)

21   Petitioner claims that his conviction must be reversed because (1) it was based on the testimony

22

23   _____
     [1] As petitioner is currently housed at San Quentin State Prison, where Michael Martel is
24   the Acting Warden, the court will grant respondent's request to substitute Martel as the
     respondent in this action.  See Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir.
25   1994) ("A petitioner for habeas corpus relief must name the state officer having custody of him
     or her as the respondent to the petition."); Rule 2(a), 28 U.S.C. foll. § 2254; Cal. Code Regs. tit.
26   15, § 3379(a)(9)(I) (2009) (providing that an inmate transferred to an out-of-state facility remains
     under the legal custody of the CDCR).

                                          1

of an accomplice, which was not sufficiently corroborated; (2) the case was presented to the jury
on three alternate theories, two of which were incorrect; (3) evidence of petitioner's prior bad
acts was improperly admitted, in violation of his federal due process rights; and (4) the
prosecutor withheld exculpatory evidence from the defense, rendering the trial fundamentally
unfair.  (Pet. at 16-48.)  Also pending is petitioner's request for an evidentiary hearing on Claim
(4), to which respondent has filed an opposition.  (Dkt. Nos. 27, 28.)

Upon careful consideration of the moving papers and the record, the undersigned
concludes that petitioner's claims for relief and motion for evidentiary hearing should be denied.

II.  AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for
persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and
Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim-
>
> > (1) resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an
> > unreasonable determination of the facts in light of
> > the evidence presented in the State court
> > proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed
"that § 2254(d) does not require a state court to give reasons before its decision can be deemed to
have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).
Rather, "when a federal claim has been presented to a state court and the state court has denied
relief, it may be presumed that the state court adjudicated the claim on the merits in the absence
of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

1    v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

2    whether a decision appearing to rest on federal grounds was decided on another basis).  "The

3    presumption may be overcome when there is reason to think some other explanation for the state

4    court's decision is more likely."  Id. at 785.

5            The Supreme Court has set forth the operative standard for federal habeas review

6    of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an

7    *unreasonable* application of federal law is different from an *incorrect* application of federal

8    law.'"  Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362 (2000).  "A

9    state court's determination that a claim lacks merit precludes federal habeas relief so long as

10   'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

11   citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).   Accordingly, "a habeas court must

12   determine what arguments or theories supported or . . could have supported[] the state court's

13   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

14   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

15   "Evaluating whether a rule application was unreasonable requires considering the rule's

16   specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

17   case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

18   short of imposing a complete bar of federal court relitigation of claims already rejected in state

19   court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does

20   not mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v.

21   Andrade, 538 U.S. 63, 75 (2003).

22           The habeas corpus petitioner bears the burden of demonstrating the objectively

23   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

24   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

25   show that the state court's ruling on the claim being presented in federal court was so lacking in

26   justification that there was an error well understood and comprehended in existing law beyond

3

1   any possibility for fairminded disagreement." <u>Harrington</u>, <u>supra</u>, 131 S.Ct. at 786-787. "Clearly

2   established" law is law that has been "squarely addressed" by the United States Supreme Court.

3   <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique

4   situations will not qualify as clearly established. <u>See</u> e.g., <u>Carey v. Musladin</u>, 549 U.S. 70, 76

5   (2006) (established law not permitting state sponsored practices to inject bias into a criminal

6   proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of

7   uniformed guards does not qualify as clearly established law when spectators' conduct is the

8   alleged cause of bias injection). The established Supreme Court authority reviewed must be a

9   pronouncement on constitutional principles, or other controlling federal law, as opposed to a

10   pronouncement of statutes or rules binding only on federal courts. <u>Early v. Packer</u>, 537 U.S. 3, 9

11   (2002).

12          The state courts need not have cited to federal authority, or even have indicated

13   awareness of federal authority in arriving at their decision. <u>Early</u>, <u>supra</u>, 537 U.S. at 8. Where

14   the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

15   federal court will independently review the record in adjudication of that issue. "Independent

16   review of the record is not de novo review of the constitutional issue, but rather, the only method

17   by which we can determine whether a silent state court decision is objectively unreasonable."

18   <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).

19          Finally, if the state courts have not adjudicated the merits of the federal issue, no

20   AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

21   <u>James v. Ryan</u>, __ F.3d __, 2012 WL 639292 *18-19 (9th Cir. 2012).

22   III.  <u>Background</u>

23   A. <u>Facts</u>

24          In its unpublished memorandum and order affirming petitioner's judgment of

25   conviction on appeal, the California Court of Appeal for the Third Appellate District provided

26   the following factual summary of petitioner's offense and conviction:

4

A jury convicted defendant Calixto Cada Racimo of second degree murder and found that he or a coprincipal was armed with a firearm in the offense. (Pen.Code, §§ 187, subd. (a), 189, 12022, subd. (a)(1).)

. . .

FACTUAL AND PROCEDURAL BACKGROUND

The discovery and autopsy of the body

On August 24, 2002, the body of Christopher Pearson, which had a cement-filled backpack strapped to it, was found floating face down in a slough near Clarksburg. The condition of Pearson's body was consistent with it having been in the water since August 3 or 4, 2002, when Pearson was last seen alive.

Pearson had been shot five times: four copper-washed .22-caliber long bullets to the chest, which caused his death, and one .38-caliber or 9-millimeter bullet to the buttocks. The bullets could not be linked to specific guns, because their fine markings had saturated away.

The methamphetamine-for-guns swap-accomplice testimony

The trial court instructed the jury that, if it found that a murder was committed, John Rodricks was an accomplice as a matter of law. Rodricks testified as follows (supplemented as indicated by Damon Shakibai, whose status as a murder accomplice was left to the jury.

The victim here, Pearson, and two others – Shakibai and Hoang Nguyen (aka "Moochie") – hatched a scheme in July 2002 whereby they would bring pure "ice" methamphetamine from Los Angeles to Sacramento and swap it for guns, which they would then sell in southern California. Rodricks came in on the tail end of this plan. Pearson's role was to obtain the methamphetamine; Nguyen's was to swap it for the guns; and Shakibai's was to sell the guns.

Pearson obtained a brick-sized amount of pure methamphetamine (on credit, Shakibai testified). Pearson and Rodricks drove with it to Sacramento in Pearson's Ford Probe. There they met Nguyen and defendant.

Nguyen, defendant and Pearson went to obtain the guns. This endeavor proved fruitless. No one was willing to trade guns for the methamphetamine "straight up." (According to Shakibai, Nguyen had told him that a "crate" of nine or 10 new 9-millimeter pistols would be swapped.)

Pearson then came up with a new plan: The methamphetamine would be left with Nguyen who would cut it to create more product

and thus more profit; this would allow them to purchase the guns. In a good faith gesture, Pearson and Rodricks were given three or four guns as they parted for Los Angeles (according to Shakibai, these guns were a 9-millimeter semiautomatic pistol, a 12-gauge shotgun, a .357-caliber revolver, and a semiautomatic military rifle).

A few weeks of delay then ensued from Nguyen's end, and Pearson began to "freak[ ] out." (According to Shakibai, Pearson called Nguyen's parents telling them about their son's exploits and that he (Pearson) wanted his "bunch of ... methamphetamine" back. Nguyen was not pleased, and he threatened Pearson.)

Pearson and Rodricks then returned to Sacramento in the Ford Probe. They met up with Nguyen, who was driving a Nissan Maxima and who told Rodricks that "you shouldn't be here" because it was "his day [meaning Pearson's]." The three men drove to the home of Carolyn Backues, who was a friend of defendant's. Defendant was there.

Nguyen left the Backues's residence in the Ford Probe, purportedly to pick up the guns. Rodricks, Pearson and defendant later left the residence in the Maxima to meet up with Nguyen and the firearms. Rodricks drove pursuant to defendant's directions. All four of the men eventually met near a "river."

Rodricks parted company with the three others to go urinate on the embankment. As he was doing so, he heard a scuffle and then a shot. He looked up and saw Pearson's silver .380 automatic in Nguyen's hand. "[F]reaking out," Rodricks ran away and stayed down on the ground until he heard the Probe drive away. He then got in the Maxima and left. He texted Nguyen, who responded that Rodricks need not worry – what had happened had nothing to do with him. Eventually, Nguyen, Rodricks and defendant rendezvoused and returned to the Backues's residence.

At the Backues's residence, Nguyen said that Pearson had disrespected him, and defendant said he (defendant) had "dumped the clip into" Pearson. Defendant described shooting Pearson "about five more times," physically demonstrating Pearson's body moving "back and forth" and saying it was like a movie.

Rodricks later looked in the Probe and saw a hand (Pearson's) sticking out of the hatchback. Rodricks also saw defendant drop a cinder block in the rear area of the car. Nguyen and defendant stated they planned to dump the body, defendant saying later they gave Pearson some "cement shoes." (Rodricks pleaded no contest to voluntary manslaughter and received a three-year state prison term, a term he had already served in presentence custody.)

\\\\\

6

<u>Carolyn Backues's and Charles Speaks's testimony</u>

Carolyn Backues was a friend of defendant's, and he was almost "always" at her house. Around the time of her birthday in 2002 (August 4), defendant was at her place, along with Nguyen, Rodricks and Pearson. The next morning, after discovering to her dismay that Rodricks was still there (having spent the night), she asked defendant where the other one was (i.e., Pearson). Defendant replied that he had gone fishing, or was on vacation. Backues also overheard defendant and Rodricks talking about bloodstains in a car. Backues's boyfriend, Charles Speaks, at trial confirmed seeing defendant at the house with Nguyen, Pearson and Rodricks.

<u>Physical evidence</u>

Pearson's cell phone records showed that his phone had made calls to two phones that defendant used in the July to August 2002 time frame, and had made no calls after August 4, 2002. Pearson's cell phone apparently had also made dozens of calls to two phones used by Nguyen in this time frame.

A search of Pearson's Ford Probe disclosed his bloodstains in the hatchback area, as well as four bullets, including one .380-caliber, and two .22-caliber-one of which was a long rifle bullet and the other a fired one that was found underneath the hatchback carpet. Rodricks's former girlfriend testified that a scared and frazzled Rodricks came to stay with her in August 2002 after returning from Yolo County, telling her that Pearson was "missing." During Rodricks's stay, she saw him cleaning the Ford Probe with ArmorAll.

A search of defendant's residence disclosed nearly four hundred .22-caliber bullets, a handful of which were similar to those found in Pearson's chest (copper-coated and long rifle). Also found were a 12-gauge shotgun shell box, five such shells, eight 9-millimeter Luger handgun shells, a .357 bullet, and some military rifle rounds.

A search of Nguyen's residence disclosed some .22-caliber bullets consistent with those recovered from Pearson's body, along with a "clip" for .22-caliber long rifle ammunition.

Three unopened concrete bags, and a fourth opened bag, were found in Nguyen's backyard. Two or three empty concrete bags were also found in a trash pile in Backues's side yard or patio.

<u>Defendant's statements</u>

The police interviewed defendant on November 4, 2002, a tape of which was played for the jury, which also had a transcript.

During the interview, defendant claimed not to recognize Pearson's

photograph. He also equivocated about recognizing Nguyen's photo, but insinuated he did not know him.

When asked in the interview why anyone would want to falsely accuse him of Pearson's murder, defendant replied that a lot of people did not like him because he did "collections"-he was the "last resort," the "cleanup crew"; he provided "backup" for his friends. This activity had embroiled defendant in fatal shootings (although he also said he "ain't had to kill nobody yet") and in cutting off someone's fingertip. (On appeal, defendant has challenged the admission of this evidence, which we will discuss later.)

The police found two of defendant's interview statements significant: one, that if he had killed Pearson, he "would have just tagged him on the street" (when it had not been disclosed where Pearson's body had been found); and, two, when defendant asked whether the informant against him was from Los Angeles (when this was known only to law enforcement, the informant being Rodricks).

Aside from this November 4, 2002 interview, another officer testified that he heard defendant, in June of 2003, threaten Rodricks on the jail-court transport bus that "You're going to go down for this. You know you're going to pay for this."

<u>Defense</u>

During defendant's second trial, the defense discovered for the first time that Rodricks had admitted on two occasions – in recorded statements on July 7, 2004, and on August 26, 2004 – that he had possessed the .22-caliber firearm at the time Pearson was first shot. This evidence was presented to the jury, with an instruction that the prosecution had belatedly disclosed it to the defense. (This evidence comprises one of defendant's challenges on appeal, which we will discuss later.) At trial, Rodricks had testified that Pearson had a .22-caliber gun that Rodricks carried for about a week in July 2002 before returning it to Pearson.

<u>People v. Racimo</u>, 2010 WL 1172052 at **1-4 (Ct. App. Third App. Dist. March 26, 2010), also filed as Lod. Doc. 4[2] ("Ct. of Appeal Opinion").  The state court's summary of facts is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).

\\\\\

---

[2] Lodged documents refer to those records lodged by respondent on September 13, 2011. (Dkt. No. 25.)

B. Procedural History

Petitioner timely appealed to the California Court of Appeal, Third Appellate District, raising the same four claims as in the instant petition.  (Lod Doc. 1.)  The California Court of Appeal affirmed the judgment in a reasoned opinion on March 26, 2010.  (Ct. of Appeal Opinion.)

Petitioner filed a petition for review in the California Supreme Court, raising the same claims as Claims (1), (3), and (4) of the instant petition.  (Lod. Doc. 5.)  The California Supreme Court summarily denied the petition on June 9, 2010.  (Lod. Doc. 6.)  Petitioner commenced the instant action on December 30, 2010.  (Dkt. No. 1.)  After his original petition was dismissed with leave to amend (Dkt. No. 6), he filed the operative First Amended Petition on January 31, 2011.  (Pet.)  Respondent filed an answer and petitioner filed a traverse.  (Dkt. Nos. 21, 22.)  On January 31, 2012 petitioner filed the pending motion for evidentiary hearing on Claim (4), and respondent filed an opposition.  (Dkt. Nos. 27, 28.)

IV.  Analysis

A.  Claim 1 - Accomplice Testimony

Petitioner claims that his conviction must be reversed as it was based on the testimony of John Rodricks, whom the trial court deemed an accomplice as a matter of law. Petitioner does not take issue with Rodricks' designation as an accomplice, but argues that his testimony was not corroborated under Cal. Penal Code section 1111, which provides:

> A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
>
> An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant who is on trial in the cause in which the testimony of the accomplice is given.

\\\\\

1    Except for a footnote concerning the remedy sought, petitioner's argument for this claim is based

2    entirely on state law. (Pet. at 16-22.)

3              A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

4    of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

5    1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

6    unavailable for alleged error in the interpretation or application of state law.  Middleton, 768

7    F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

8    Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

9    issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).  In this regard, federal

10   collateral review of a state criminal conviction is limited to determining whether petitioner's

11   federal constitutional or other federal rights have been violated and does not extend to review a

12   state's application of its own laws.  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)

13   (recognizing that the decision whether to impose sentences concurrently or consecutively is a

14   matter of state criminal procedure and is not within the purview of federal habeas corpus);

15   Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).

16             In arguing that the trial court violated Cal. Penal Code section 1111, petitioner has

17   not raised a claim upon which federal habeas relief may be granted.  In the last reasoned state

18   court decision addressing this claim, the Court of Appeal held that "there was sufficient

19   independent evidence to corroborate accomplice Rodricks' testimony[]" under the California

20   statute. (Ct. of Appeal Opinion at 8-11.)  A state court's interpretation of this statutory language

21   is binding on a federal court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76

22   (2005) ("We have repeatedly held that a state court's interpretation of state law, including one

23   announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

24   corpus."); Estelle v. McGuire, 502 U.S. at 67-68.  Thus petitioner is not entitled to federal habeas

25   relief with respect to Claim 1.

26   \\\\\

1    B.  Claim 2 – Alternate Theories

2           Petitioner claims that the case against him was presented to the jury on three

3    alternative theories of culpability, two of which were incorrect.  He argues that the erroneous

4    instructions warrant reversal of his conviction.  (Pet. at 23-31.)  However, petitioner made no

5    attempt to raise this argument in his petition to the California Supreme Court.  (Lod. Doc. 5.)  In

6    the traverse, petitioner concedes that he did not present this claim to the California Supreme

7    Court, as he believed doing so would be futile.  (Dkt. No. 22 at 2-3.)

8           The exhaustion of state court remedies is a prerequisite to the granting of a

9    petition for writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  If exhaustion is to be waived, it must

10   be waived explicitly by respondent's counsel.  28 U.S.C. § 2254(b)(3).  A waiver of exhaustion,

11   thus, may not be implied or inferred.  A petitioner satisfies the exhaustion requirement by

12   providing the highest state court with a full and fair opportunity to consider all claims before

13   presenting them to the federal court.  O'Sullivan v. Boerckel, 526 U.S. 838, 839-40 (1999)

14   ("[f]ederal habeas relief is available to state prisoners only after they have exhausted their claims

15   in state court"); Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Picard v. Connor, 404 U.S.

16   270, 276 (1971); Middleton v. Cupp, supra, 768 F.2d 1083, 1086.  Where petitioner did not meet

17   his burden to demonstrate state court exhaustion of claims, "[t]he district court should have

18   dismissed the petition for failure to exhaust."[3]  Cartwright v. Cupp, 650 F.2d 1103, 1104 (9th

19   Cir.), cert. denied,455 U.S. 1023 (1982).  Moreover, "[i]f it plainly appears from the petition and

20   any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must

21   dismiss the petition...."  Rule 4, Rules Governing Section 2254 Cases.

22          Because petitioner failed to present Claim 2 to the state's highest court, he is not

23   entitled to federal habeas relief with respect to this claim.

24   \\\\\

25   

26          [3] A petition may be denied on the merits without exhaustion of state court remedies.  28
     U.S.C. § 2254(b)(2).

C. Claim 3 – Prior Bad Acts

Petitioner next claims that the admission of his videotaped statement to police in which he described himself as a "collector" and "the clean-up crew" was prejudicial error.

Petitioner cites California Evidence Code section 1101, subdivision (a), which provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." The statute further provides that nothing prohibits the admission of evidence "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident[.]" Cal. Evid. Code § 1101(b). Petitioner argues that the "uncharged bad acts" described in his videotaped statement were both highly prejudicial and inadmissible under this statute.

In the last reasoned state court decision to address this claim[4], the Court of Appeal wrote:

Defendant contends the trial court erroneously denied his motion and renewed motions to exclude evidence of some prior bad acts on his part. This evidence was elicited from defendant himself during his November 4, 2002 police interview. We find no prejudicial error.

During that interview, the police asked defendant why someone would want to falsely accuse him of the Pearson killing. Defendant explained that his work in "collections" had caused a lot of people not to like him. Defendant elaborated:

"[I] work as [ ] collections for various people and if they don't pay their money to various people, I go over there, they call me to do collecting. I mean, last resort. I'm the cleanup crew. They owe whatever, but they don't have the balls to do [their] own collections and other people, shit, they are even scared of me or they don't like

---

[4] The California Supreme Court issued a summary denial of plaintiff's claims. When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

me because I'll do it. [] ... []

"... I ain't had to kill nobody yet, but ... I beat them down. [Although defendant also said that he had shot and killed one or two persons in self-defense]. [] ... []

"[I] never had to go that far ..., knock somebody up, ... maybe cut a finger, I never even did that yet [although later in the interview, defendant acknowledged that he had taken off a fingertip]. [] ... []

"[I] don't have no phone ... so [those seeking collections] either come over or they don't. I don't go look for no drug collection job. It's usually my friends. They need help. Like they need backup. That's me. [] ... []

"[I]t's not even collections, they need backup, but usually it works."

Evidence of a defendant's other bad acts is inadmissible if offered merely to prove defendant's disposition to commit the charged offense. (Evid. Code, § 1101, subd. (a).) But such evidence is admissible if relevant to prove some pertinent fact – such as motive, opportunity, intent or identity – other than a disposition to commit such acts. (Evid. Code, § 1101, subd. (b).) This evidence is also subject to Evidence Code section 352's policy of excluding probative, but unduly prejudicial, evidence. [Citations.]  Whether to allow in evidence of bad acts is within the trial court's discretion, but this kind of evidence can be inflammatory. [Citations.]

Arguably, the challenged evidence went to defendant's motive or opportunity for participating in the Pearson killing. (Evid. Code, § 1101, subd. (b).) There was evidence of the roles played by the other participants in the methamphetamine-for-guns swap, but the part cast for defendant was less clear. Defendant's own statements about being the "cleanup crew" and providing "backup" for his friends tied in with the following evidence: The other participants were simply middle-class junior college students in obvious need of muscle; defendant's friend, Nguyen, had made a mess of things by not being able to obtain the guns; defendant had supplied the guns used for the initial good faith deposit; Pearson may not have died immediately; and defendant shot Pearson repeatedly after Nguyen fired the first shot.

On the other hand, defendant's prior actions as the cleanup crew and backup could not be used merely to show his disposition to act as the cleanup crew and backup in the Pearson incident. (Evid. Code, § 1101, subd. (a).) Apparently the trial court did not specifically instruct the jury on the limited use of this evidence. There was a fine line here between inadmissible evidence of disposition and admissible evidence of motive or opportunity.

\\\\\

13

Nevertheless, we find any error in this regard harmless. The erroneous admission of evidence warrants reversal only if it is reasonably probable that defendant would have fared better absent the error. [Citation.]  Defendant tries to snag the more favorable standard of prejudice involving a federal constitutional error – i.e., the error did not contribute to the verdict beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24.) To obtain that standard in the evidentiary context presented here, defendant has to show the error "rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." (Jammal v. Van de Kamp (9th Cir.1991) 926 F.2d 918, 920; McKinney v. Rees (9th Cir.1993) 993 F.2d 1378, 1385.) In light of our equivocating analysis above, this egregious level of error was never reached.

We do not think it reasonably probable that defendant would have fared better had this evidence been excluded. There was Rodricks's testimony about defendant stating he had "dumped the clip into" Pearson (while graphically demonstrating Pearson's whole body moving back and forth like a movie), and stating that Pearson had been given "cement shoes." The "collection" evidence was no more emotionally charged than this evidence. As noted in the previous sections of this opinion, aside from Rodricks's testimony, there was the testimony of Shakibai, Backues and Speaks; there was the physical evidence of Pearson's cell phone records, and of the possibly incriminating bullets found in defendant's residence; there were the concrete bags found in the trash pile at Backues's house; there was the bloodstained Ford Probe; and, finally, there were defendant's own statements threatening Rodricks and suggesting knowledge of the murder.

(Ct. of Appeal Opinion at 16-20.)

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb a state court's decision to admit evidence on due process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it rendered the trial fundamentally unfair."  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); see also Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  In addition, in order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error

1    was one of constitutional dimension and that it was not harmless under <u>Brecht v. Abrahamson</u>,

2    507 U.S. 619 (1993).  Thus, in order to grant relief, the habeas court must find that the error had

3    "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th

4    Cir. 2001) (quoting Brecht, 507 U.S. at 623).

5            Here, the applicable federal statute is Federal Rule of Evidence 404, subd. (b),

6    which provides:

7            Evidence of other crimes, wrongs, or acts is not admissible to
             prove the character of a person in order to show action in
8            conformity therewith.  It may, however, be admissible for other
             purposes, such as proof of motive, opportunity, intent, preparation,
9            plan, knowledge, identity, or absence of mistake or accident[.]"

10   While the Court of Appeal did not address the requirements of Federal Rule of Evidence 404(b),

11   it analyzed the admissibility of petitioner's statements under Cal. Evidence Code section 1101,

12   which is substantively the same rule.  The state court reasonably determined that evidence of

13   petitioner's prior bad acts was "arguably" admissible under this rule because it tended to show

14   that, despite his lack of an apparent reason to want Pearson dead, petitioner had a motive for

15   killing him: to provide "backup" for his friends when a drug deal involving Pearson went sour.

16   Petitioner's motive – or lack thereof – was at issue in the case.  In his closing argument to the

17   jury, petitioner's counsel challenged the sufficiency of the evidence that  petitioner was a party to

18   the drugs-for-gun swap (<u>see</u> 5 Record of  Transcript on Appeal ("RT") 1216, 1231-33),

19   suggesting that petitioner lacked a motive to kill Pearson when the scheme broke down.

20   Petitioner's counsel also emphasized that Nguyen ("Moochie") had a personal reason to kill

21   Pearson, as Pearson had made a telephone call to Nguyen's parents informing them that Nguyen

22   was dealing drugs.  (5 RT 1231.)

23           However, as the state court acknowledged, it is also possible that petitioner's prior

24   bad acts were considered for the impermissible purpose of showing petitioner's tendency to act

25   as "the clean up crew" in the crime charged.  In his closing argument, the prosecutor stated:

26   \\\\\

15

> Clean-up crew.  What that means is there's a big mess now.
> We've got Christopher Pearson calling Moochie's parents house. . .
> . Chris is getting squeezed for his money.  Damon's guys that want
> to buy the guns are calling Damon, Damon and Chris are calling
> Moochie, where is our stuff, and Moochie has a big problem on his
> hand.  He's got a big mess that needs to be cleaned up.
>
> And he tells us he's the clean-up crew when people don't have the
> balls to do it themselves.  So now what does that mean?  Well that
> means exactly what happens in this case.  That means it is Chris's
> day.

(5 RT 1198-1199.)  Particularly in the absence of a clarifying instruction, these statements could

well have confused the jury as to the proper use of the challenged evidence.

Even so, the state court concluded that any error in this regard was harmless,

given the other compelling evidence of petitioner's guilt.  The undersigned similarly concludes

that, on habeas review, petitioner has not established that the error had a "substantial and

injurious effect" on the verdict.  Dillard, supra, 244 F.3d at 767. n.7.  As the state court observed,

there was evidence that, shortly after Pearson was killed, petitioner boasted that he "dumped the

clip" into Pearson and demonstrated how Pearson's body moved when he was shot.  Hundreds of

bullets similar to those used to kill Pearson were found at petitioner's residence.  Overwhelming

evidence showed that petitioner and Nguyen were the key players in Pearson's murder and in the

disposal of his body, including statements made by petitioner at his November 4, 2002 interview,

unrelated to his past "collections" activity but serving to implicate petitioner in the murder.

Insofar as petitioner's history as the "clean-up crew" was not used to prove motive or other

permissible factors, it cannot be said to have had a "substantial and injurious effect" on the

verdict in light of copious other evidence of petitioner's guilt.

D.  Claim 4 – Prosecutorial Misconduct

Petitioner claims that the prosecutor withheld exculpatory evidence from the

defense, which rendered the trial fundamentally unfair.  Specifically, he claims that the

prosecutor failed to inform the defense of the statements which Rodricks made to police on July

7, 2004 and August 26, 2004, as required by Brady v. Maryland, 373 U.S. 83 (1963).

16

1          In the last reasoned state court decision to address this claim, the Court of Appeal

2    wrote:

3          This issue first arose well into the second trial[5] when the defense
           was cross-examining accomplice Rodricks and discovered that he
4          had made two consistent inculpatory (recorded) statements that had
           never been disclosed to the defense.

5
           The first recorded statement that was uncovered was one on
6          August 26, 2004, that Rodricks had given to a private polygraph
           examiner before the exam (during the first trial, Rodricks's attorney
7          wanted his client to be a prosecution witness and sought the
           polygraph to entice the arrangement; also, law enforcement and the
8          prosecutor had attended the August 26 statement). In this
           statement, Rodricks admitted that he had the .22-caliber firearm
9          when Pearson was first shot.

10         After uncovering this statement, defense counsel accompanied an
           investigating detective to the police evidence locker to see if the
11         defense was missing "anything else." Indeed, a July 7, 2004 police
           interview of Rodricks was located that had not been disclosed
12         previously (as well as an accompanying computer voice stress
           analysis). In the July 7 statement, Rodricks admitted "to having the
13         .22[-caliber gun] on his person at the time of the river incident."
           (The prosecutor had attended at least a part of this interview as
14         well.)

15         At the second trial, Rodricks testified that he had possessed
           Pearson's .22-caliber gun for about a week prior to July 17, 2002,
16         and then gave it back to Pearson.

17         Defendant unsuccessfully moved to dismiss and for a new trial
           based on prosecutorial misconduct in failing to disclose these two
18         recorded statements in discovery.

19         The case of Brady v. Maryland (1963) 373 U.S. 83 is the seminal
           decision in this arena.  Brady held that if the prosecution
20         suppresses material evidence favorable to an accused, the
           prosecution violates due process irrespective of its good or bad
21         faith. (Brady, at p. 87; [Citations.])  The duty to disclose such
           evidence exists even in the absence of a request, and disclosure
22         must be made at a time when it would help the accused.
           [Citations.]

23

24         [5] Petitioner was convicted of Pearson's murder in a previous trial, but that conviction was
     reversed "because the prosecutor prejudicially argued to the jury that it could convict defendant
25   of murder as an aider and abettor if his only involvement was helping to dispose of the body after
     the murder."  (Ct. of Appeal Opinion at 1.)  The instant petition challenges petitioner's
26   conviction after his second trial on these charges.

" 'There are three components of a true <u>Brady</u> violation: [ (1) ] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [ (2) ] that evidence must have been suppressed by the State, either willfully or inadvertently; and [ (3) ] prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] ... A defendant ... 'must show a "reasonable probability of a different result." ' " [Citations.]

Defendant's <u>Brady</u> claim falters on the third component: prejudice.

First and foremost, the evidence at issue – Rodricks's two inculpatory recorded statements – was presented to the jury. Defendant notes that the evidence was disclosed belatedly, which it was, and that his cross-examination of Rodricks would have been more focused, which it would have been. But defendant declined the trial court's offer of a "brief continuance" to investigate further, and refused to recall Rodricks to the witness stand, though he was still available to testify.

Second, the likely reason for these defense tactics (and this reason cuts directly to prejudice as well) was that the evidence at issue – the July 7 and the August 26 statements of Rodricks – was presented to the jury in a manner that could not have played more dramatically to defendant's advantage. The evidence was disclosed at a dramatic moment, when the trial was well under way. It undercut the prosecution's chief witness. The foibles of the prosecution and of law enforcement in failing to disclose this evidence were placed on center stage for the jury: The prosecutor and the testifying detectives in this case had been present for both statements; the police had carelessly tossed the videotape of the August 26 statement into a box for another case, apparently without looking; and the July 7 statement was found only after defense counsel accompanied law enforcement to the police evidence locker to see if "anything else" was missing.

Indeed, the prosecutor opened his closing argument with this drama, stating: "As you have surmised throughout the course of this trial, cases don't get any more serious than this. This is a murder case. And with that, there are a couple of things that happened during this trial that I want to apologize for before we get started .[] There's no excuse that I can give you, nor will I, regarding how Investigator Stewart handled that particular videotape [August 26 statement] when he told us that he tossed it up into the box and tossed it a little too far. It landed in another homicide box. There's no excuse for that.... [] The other issue was the two videotapes [July 7 statement and stress analysis] that were discovered in the correct box, but as the detective stated, he had forgotten that interview took place. There's no excuse."

18

In addition to the fact that the challenged evidence was presented
to the jury – and was presented in a manner the jury would not
soon forget – other facts support the conclusion that it is not
reasonably probable defendant would have fared better had the
evidence been disclosed properly. These other facts include: the
evidence of defendant's guilt, summarized previously in this
opinion; the defense's extensive attack on Rodricks's credibility in
closing argument, using the statements at issue; the trial court's
instruction that Rodricks was an accomplice, whose trial testimony
had to be viewed with caution and had to be corroborated; and,
finally, the trial court's instruction on untimely disclosure of
evidence, which stated:

"Both the People and the defense must disclose their evidence to
the other side before trial, within the time limits set by law. Failure
to follow this rule may deny the other side the chance to produce
all relevant evidence, to counter opposing evidence, or to receive a
fair trial. [] An attorney for the People failed to disclose: recorded
interviews of John Rodricks made on July 7, 2004, and August 26,
2004.[] In evaluating the weight and significance of that evidence,
you may consider the effect, if any, of that late disclosure." (CALCRIM No. 306.)

(Ct. of Appeal Opinion at 20-24.)

In criminal cases, the prosecution has a duty to disclose all material evidence that

is favorable to the accused.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  This duty extends not

only to exculpatory evidence but also to "evidence that the defense might have used to impeach

the Government's witnesses by showing bias or interest."  United States v. Bagley, 473 U.S. 667,

676 (1985.)  Evidence is material if "there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."  Id. at 682.

Showing that the prosecution failed to disclose exculpatory evidence is not enough to entitle

petitioner to habeas relief; he must also show that he suffered prejudice – that is, that there is a

reasonable probability that the outcome of the trial would have been different had the evidence

been disclosed.  Gannt v. Roe, 389 F.3d 908, 913 (9th Cir. 2004), citing Strickler v. Greene, 527

U.S. 263, 281-82 (1999).

On January 31, 2012, petitioner filed a motion for an evidentiary hearing on this

claim.  (Dkt. No. 27.)  He attached a signed declaration stating that he "did not have a gun or pull

the trigger of a gun that was used to kill" Pearson.  (Id. at 1.)  Petitioner argues that under the recent case of Smith v. Cain, 132 S.Ct. 627, ---- U.S. ----, (Jan. 10, 2012), he is entitled to expand the record to include this declaration.  Petitioner also appears to request an evidentiary hearing on whether he is entitled to some form of relief based on his declaration and the Supreme Court's decision in Smith.

In Smith, the Supreme Court held that the State of Louisiana's failure to produce evidence impeaching eyewitness testimony violated the disclosure rule in Brady, requiring a new trial on Smith's conviction for first-degree murder.  Notably, Smith was not a federal habeas action governed by AEDPA; rather, the Supreme Court granted certiorari to directly review the decision of the Louisiana Supreme Court.  Id. at 630.

Smith was convicted of first-degree murder following a trial in which a single witness, Larry Boatner, linked Smith to the crime.  Boatner testified that, while he was at a friend's house, Smith and two other gunmen entered the home, demanded money and drugs, and began shooting Boatner's friends.  "No other witnesses and no physical evidence implicated Smith in the crime."  Id. at 629.

As part of Smith's effort to gain post-conviction relief, he obtained files from the police investigation in the case, including the notes of Detective John Ronquillo, which were not made available to Smith during his trial.  Detective Ronquillo's notes contained statements by Boatner that conflicted with his testimony identifying Smith as a perpetrator, including Boatner's statements that he could not describe the perpetrators except to say they were black males, "could not ID anyone because [he] couldn't see faces," and "would not know them if [he] saw them."  Id. at 629-630.  Because the State conceded that these statements were both undisclosed and favorable to Smith, the Court focused on whether the statements were "material" under Brady, i.e., whether there was "a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different."  Id. at 630, citing Cone v. Bell, 556 U.S. 449, 469-470 (2009).  The Court concluded that the undisclosed statements were "plainly material," as

1  "Boatner's testimony was the only evidence linking Smith to the crime" and the undisclosed

2  statements directly contradicted this testimony.  (Id. at 630; emphasis in original.)

3          Smith is clearly distinguishable from the instant case, in which Rodricks'

4  previously undisclosed statements were presented to the jury at trial, and varied and substantial

5  evidence implicated petitioner in the crime.  The court will duly consider Smith in ruling on the

6  merits of petitioner's claim, discussed below.

7          In any case, petitioner is not entitled to an evidentiary hearing at this stage.  In

8  Cullen v. Pinholster, __U.S.__, 131 S.Ct. 1388 (2011), the Supreme Court held that, when a state

9  court decides a habeas claim on the merits, the federal court's inquiry under 28 U.S.C. §

10  2254(d)(1) is limited to the record before the state court.  Courts since Pinholster agree that the

11  limitation of review to the state court record also applies to review under § 2254(d)(2).  E.g.,

12  Coddington v. Cullen, No. CIV S 01-1290 KJM GGH, 2011 WL 2118855 (E.D. Cal. May 27,

13  2011).  Here, because the state court of appeal decided petitioner's habeas claims on the merits,

14  the record on federal habeas review is limited to the record before the state court.  Accordingly,

15  the court will deny petitioner's motion for evidentiary hearing and/or to expand the record.

16          As to the merits of Claim 4, the state court of appeal reasonably concluded that

17  the state's belated disclosure of Rodricks' statements did not violate the Brady doctrine under the

18  circumstances of this case.  The Supreme Court's recent decision in Smith constitutes a

19  straightforward application of the Brady rule and does not command a different result than the

20  one reached by the state court.  Thus petitioner is not entitled to federal habeas relief on Claim 4.

21  V.  Conclusion

22          For the reasons set forth above, the undersigned finds that petitioner is not entitled

23  to federal habeas relief on the submitted petition.

24          Accordingly, IT IS HEREBY ORDERED that:

25          1.  The Clerk of Court shall substitute Michael Martel as respondent in the docket

26  of this action; and

1        2.  Petitioner's January 31, 2012 motion for evidentiary hearing (Dkt. No. 27) is

2  denied.

3        IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

4  habeas corpus be denied and this action closed.

5        These findings and recommendations are submitted to the United States District

6  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

7  days after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10  shall be served and filed within fourteen days after service of the objections.  The parties are

11  advised that failure to file objections within the specified time may waive the right to appeal the

12  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  Dated: May 3, 2012

14

15                                    CAROLYN K. DELANEY
                                      UNITED STATES MAGISTRATE JUDGE

16

17

18  2
    raci3486.evid

19

20

21

22

23

24

25

26

22